## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **ROBERT HAZARD,**<br><br>               **Plaintiff,**<br><br>  **v.**<br><br>**B&B HOTELS US, INC.,**<br><br>  **and**<br><br>**AMIR MUSTAFA,**<br><br>              **Defendants.** | **CIVIL ACTION NO. _____**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT AND JURY DEMAND

Plaintiff Robert Hazard, by and through his attorneys, Bell & Bell LLP, hereby files the following Complaint and Jury Demand ("Complaint"):

## PRELIMINARY STATEMENT

1.      This is an action for an award of damages, attorneys' fees and other relief on behalf of Plaintiff Robert Hazard ("Mr. Hazard"), a former employee at B&B Hotels US, Inc. ("B&B" or "B&B Hotels US"), the United States business unit of the multinational hotel company, B&B Hotels (the "Group", the "Company" or "B&B Hotels Group"). Mr. Hazard was most recently supervised in his position by Defendant Amir Mustafa, Chief Executive Officer of B&B (collectively, B&B and Mr. Mustafa are referred to as "Defendants"). Mr. Hazard has been harmed by B&B's retaliation for his opposition to and refusal to participate in unethical and fraudulent activity by B&B, culminating in his wrongful termination on September 3, 2025. Mr. Hazard has also been harmed by B&B's breach of contract and false promises and misrepresentations with respect to the terms and conditions of his employment, which induced

Mr. Hazard to accept employment with B&B, and upon which he reasonably relied. Defendants also failed to pay Mr. Hazard earned wages in violation of the Pennsylvania Wage Payment and Collection Law.

2.      This action is filed pursuant to the Pennsylvania Wage Payment and Collection Law, 43 Pa C. S. §260.1, et seq. ("WPCL") and the common law of the Commonwealth of Pennsylvania.

## JURISDICTIONAL STATEMENT

3.      This Court has diversity jurisdiction over this matter pursuant to 28 USC. § 1332.

4.      The amount in controversy in this matter exceeds the jurisdictional minimum of $150,000 exclusive of interest and costs.

5.      The Parties hereto are citizens and/or residents of different states.

6.      Plaintiff Robert Hazard is a citizen and resident of the Commonwealth of Pennsylvania.

7.      Defendant B&B is a Delaware corporation, with its headquarters and principal place of business in Florida.

8.      Defendant Amir Mustafa is a citizen and resident of Florida.

9.      All conditions precedent to the institution of this suit have been fulfilled.

## VENUE

10.      This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 USC. § 1391(b).

11.      This action properly lies in the Eastern District of Pennsylvania because the claims and significant activities associated with the claims arose in this judicial district, and Plaintiff was employed by Defendant B&B in this judicial district.

## PARTIES

12.     Plaintiff Robert Hazard is an adult male individual who is a citizen and resident of Merion Station, Pennsylvania and the United States of America.

13.     B&B Hotels US, Inc. is a Delaware corporation with a corporate headquarters and principal place of business located at 1101 Brickell Avenue, Suite N-1000, Miami, Florida 33131.

14.     Defendant Amir Mustafa is a citizen and resident of Florida.  Mr. Mustafa was a decision maker with respect to the decision not to pay Mr. Hazard's earned but unpaid wages in violation of the WPCL.

15.     At all relevant times, Defendant B&B is and has been an employer employing less than 10 employees.

16.     At all relevant times, employees of B&B were acting as agents and servants for B&B.

17.     At all relevant times, employees of B&B were acting within the scope of their authority and in the course of employment under the direct control of B&B.

18.     At all times material hereto, B&B acted by and through its authorized agents, servants, workmen, and/or employees who were acting within the course and scope of their employment with B&B and acting in furtherance of B&B's business.

19.     At all times relevant hereto, Defendant B&B is and has been an "employer" and/or "person" within the meaning of the laws at issue in this matter, and is accordingly subject to the provisions of said laws.

20.     Defendants each are an "employer" and/or "person" within the meaning of the WPCL.

21.     With respect to the WPCL claims herein, Defendant Amir Mustafa had an active role in corporate decision making and was instrumental in the decision concerning the failure of Defendant B&B to pay wages to Mr. Hazard that are due and owing.  Mr. Mustafa was a decision maker with respect to the decision to withhold earned wages and participated in the decision to withhold Mr. Hazard's earned wages

22.     At all relevant times hereto, Plaintiff was an "employee" of B&B within the meaning of the laws at issue in this matter, and is accordingly entitled to the protections of said laws.

23.     This Honorable Court has jurisdiction over Defendants.

## FACTS

24.     Robert Hazard has built a distinguished career in the hotel industry, developing a strong record of achievements over several decades of experience.

25.     Due to his expertise and knowledge, Mr. Hazard secured prestigious and key positions in the hotel industry.

26.     For over a decade, Mr. Hazard served as a Senior Vice President for Hersha Hospitality Trust (NYSE:HT), a publicly-traded real estate investment trust.

27.     As Senior Vice President, Mr. Hazard served on the executive committee as the head of Acquisitions and Development.

28.     Following his employment with Hersha Hospitality Trust, Mr. Hazard held the position of Executive Vice President of HotelAVE, a prominent hotel asset management firm.

29.     In this position, Mr. Hazard reported directly to the Chief Executive Officer and Chief Operating Officer.

30.     In or about Fall 2022, Mr. Hazard was recruited by B&B to serve as the Senior Vice President of Development and Asset Management while he was still employed by HotelAVE.

31.     At the time, B&B Hotels US was essentially a start-up division of an international hotel company that was virtually unknown to anyone in the United States.

32.     To induce Mr. Hazard to leave his lucrative and secure position at HotelAVE in favor of a position at B&B Hotels US, B&B made certain assurances to Mr. Hazard.

33.     Specifically, Mr. Hazard was assured that he would report directly to a highly competent and experienced Chief Executive Officer ("CEO") and would be supported by a highly competent and experienced legal team.

34.     Additionally, B&B assured Mr. Hazard, both orally and in writing, that he would receive a defined severance package should his employment end for reasons beyond his control.

35.     This assurance was a heavily negotiated clause of Mr. Hazard's employment agreement and unique to Mr. Hazard, demonstrating B&B's willingness to make every effort to induce Mr. Hazard to leave HotelAVE and accept employment with B&B.

36.     Due to the assurances made to him, Mr. Hazard accepted the offer of employment at B&B and began his position as Senior Vice President of Development and Asset Management in or about November 2022.

37.     Initially, several of the assurances made to Mr. Hazard to induce him to accept employment at B&B were realized.

38.     Between November 2022 and December 2024, Mr. Hazard reported to Valerio Duchini, the then-CEO of B&B, who was indeed a competent leader and had significant experience as a leadership executive.

39.     Mr. Duchini was well aware of his responsibilities, knew the organization of the Company, as well as its policies and procedures, and he possessed a growth plan for the US office that had a clear vision and was executable.

40.     Although Mr. Hazard was subordinate to Mr. Duchini, they worked in tandem, and their partnership was fully collaborative.

41.     As such, Mr. Hazard was able to rely on Mr. Duchini, and vice versa.

42.     Additionally, the assurance made to Mr. Hazard that he would be able to rely on a competent legal team initially proved to be true.

43.     Between the start of his employment at B&B through approximately May 2025, Mr. Hazard received legal support from both in-house and outside counsel who had substantial experience in real estate in general and the hotel industry specifically.

44.     The attorneys Mr. Hazard collaborated with were individually selected and approved by the Company's Office of General Counsel in accordance with Group policy, allowing Mr. Hazard to have confidence that they were well qualified and capable.

45.     At the beginning of his employment, Mr. Hazard's role within B&B was well-defined.

46.     Mr. Hazard was trusted to manage the real estate side of the US business of B&B while Mr. Duchini and the Senior Vice President of Design & Construction oversaw and administered the other functions of the business.

47.     As Senior VP of Development and Asset Management, Mr. Hazard's primary role was to find and execute hotel acquisition deals.

48.     These hotels would then be renovated to meet the B&B Hotels standard.

49.     To fulfill his responsibilities, Mr. Hazard's duties included creating the department's policies and procedures and directing and completing all deal strategy, underwriting, contract negotiations, due diligence and deal closings.

50.     Throughout his employment with B&B, Mr. Hazard proved to be a highly exemplary and valuable employee who was able to execute his duties with immense success.

51.     As he had proven himself to be a highly proficient and skilled employee, Mr. Hazard was granted significant autonomy in his role.

52.     The combination of the autonomy extended to him, his capabilities, and his ability to collaborate with Mr. Duchini allowed Mr. Hazard to advance the Group's business in the United States and turn Mr. Duchini's vision into reality.

53.     As a result, Mr. Hazard and Mr. Duchini's accomplishments were lauded and declared to the entire Company to be evidence of how capable and dedicated individuals could achieve great feats.

54.      For their hard work and triumphs, Mr. Hazard and Mr. Duchini were repeatedly recognized and commended.

55.     In fact, during Mr. Hazard's last substantial interaction with B&B Hotels' Executive Chairman, Fabrice Collet, in May 2025, Mr. Collet directly praised and thanked Mr. Hazard for all the work he had done for the Company and proclaimed Mr. Hazard's latest deal in Daytona Beach as the "best deal to-date in the US."

56.     In fulfilling his responsibilities, whenever possible, Mr. Hazard structured his activities to maximize compliance with the policies and procedures issued by the parent company in Paris and by the Office of General Counsel.

57.     Mr. Hazard also complied with policies regarding "Submittal Materials", which included models, projections, cash flow analyses, term sheets, contracts, investment memoranda, budgets, and other such materials.

58.     Specifically, Mr. Hazard was not permitted to release Submittal Materials to "Stakeholders", (which included existing or potential investors, members of the Group's executive leadership team, the Group's board of directors or any other persons or body likely to rely on Submittal Materials in making any kind of investment decision or in setting strategy) unless such Submittal Materials had been subjected to a rigorous review and approved by the CEO.

59.     Accordingly, at no point did Mr. Hazard seek to or release any Submittal Materials that reflected any kind of personal bias.

60.     Instead, Mr. Hazard produced Submittal Materials that were based on mathematically accurate, data-driven analysis, which he would then present to Mr. Duchini for review and approval.

61.     In early 2025, the Company was reorganized.

62.     Mr. Collet transitioned from CEO of the Group to Executive Chairman, and Mr. Duchini was promoted and relocated to Paris to serve as the CEO of Western Europe.

63.     In addition, Benjamin LaCroix, who lived in Brazil but frequently visited the US, was promoted from his accounting position in Brazil to Chief Financial Officer ("CFO") of Brazil and the US.

64.     Organizationally, Mr. LaCroix became Mr. Hazard's only peer in the US office.

65.     Given the collaborative and successful partnership that Mr. Hazard had built with Mr. Duchini, Mr. Hazard was understandably concerned about the change in leadership and departure of Mr. Duchini.

66.     To assuage Mr. Hazard's concerns, B&B assured him that the search for Mr. Duchini's replacement would be limited only to candidates possessing a level of experience and capabilities comparable to those of Mr. Duchini.

67.     Thus, B&B effectively promised Mr. Hazard that he would still be able to work with a competent and collaborative leader.

68.     To further alleviate Mr. Hazard's concerns, B&B also stated that Mr. Collet would oversee the Company's interests in the Americas and would be spending one week each month in the US Office.

69.     These assurances were important not only to Mr. Hazard, but also to the entire US office.

70.     Staff at the US office approached Mr. Hazard to voice their own personal concerns with the leadership change and what it meant for the future of B&B and their employment.

71.     In response, Mr. Hazard relayed to the US office staff the assurances he was offered by B&B.

72.     Thus, the staff at the US office, including Mr. Hazard, relied upon B&B to be truthful in its assurances.

73.     In April 2025, Amir Mustafa became the new CEO for B&B Hotels US.

74.     In the announcement naming Mr. Mustafa as CEO, the Company proclaimed Mr. Mustafa to be an individual with significant knowledge, skills, and experience, particularly in

executive leadership roles, and that these qualities would allow him to further advance the Company's expansion and top priority programs in the US.

75. Appointing a leader who has the expertise to strengthen B&B's business, particularly as it related to its renovation program, was critical to the success of the Company at large.

76. However, as soon as Mr. Mustafa stepped into the role of CEO, it became abundantly clear that he had not been thoroughly and rigorously vetted by the Group per its usual standards and procedures and that he had serious limitations in relevant and transferrable skills.

77. Though B&B had promised that it would only consider individuals who had experience akin to that of Mr. Duchini when naming its new CEO, this proved to be false.

78. Mr. Mustafa had not held a position equivalent to a CEO at any large hotel company prior to being named as CEO of B&B Hotels US.

79. Mr. Mustafa displayed an inability to understand or execute his responsibilities as they related to corporate accounting, finance, deal making, money raising, contract law, corporate law, real estate, human resources, construction and renovation.

80. Mr. Mustafa's inexperience with construction and renovation was particularly troubling given that B&B's renovation program was, and remains, one of the most essential components of B&B's business plan.

81. Given Mr. Mustafa's inexperience, Mr. Hazard had concerns regarding the growth and health of the US business unit of B&B Hotels.

82. As such, Mr. Hazard approached Mr. Collet in April 2025 to ascertain Mr. Collet's vision for the US office.

83.     In that conversation, Mr. Collet acknowledged that Mr. Mustafa's lack of experience and familiarity with the requirements of his position was an issue but reassured Mr. Hazard that Mr. Mustafa would soon be traveling to Europe to complete an orientation tour that would include training on B&B Hotels' policies and procedures.

84.     Mr. Collet also reaffirmed that he would visit the US every month.

85.     While Mr. Hazard remained concerned about Mr. Mustafa's abilities, or lack thereof, Mr. Collet's promises that Mr. Mustafa would receive appropriate training and that Mr. Collet would drop in on the US office each month led Mr. Hazard to believe that Mr. Collet would exercise diligent oversight and mentorship of Mr. Mustafa and act as the *de facto* CEO, leaving Mr. Mustafa to focus on hotel operations.

86.     Despite the assurances by Mr. Collet, his last visit to the US office was in mid-May 2025, and as of August 25, 2025, he had not been scheduled to appear again until mid-October 2025.

87.     In June 2025, Mr. Mustafa hired Doga Meric as In-House Corporate Counsel for B&B to replace the expensive outside counsel services that B&B had relied on since its inception.

88.     Ms. Meric's legal background indicated that she had limited experience with the complex legal matters that B&B Hotels US encountered.

89.     Given that Mr. Hazard was the most frequent consumer of legal services in the US Office, he was well aware of the knowledge that a B&B Hotels US in-house lawyer needed to have in order to provide appropriate and relevant legal counsel.

90.     Mr. Hazard had also participated in the past in the search for an in-house lawyer for the US office and thus was well informed on the Company's hiring standards for internal legal counsel.

91.     Specifically, Mr. Hazard perceived that B&B Hotels had high standards and required attorneys to have demonstrable and in-depth experience in hotel acquisitions, construction contracts, NNN leases, purchasing, project management, hotel management agreements, human resources, vendor leases, and general contract and corporate law.

92.     However, Mr. Hazard observed that Ms. Meric fell short of these expectations as she lacked the level of experience that had historically been expected of B&B's in-house corporate counsel in these critical areas.

93.     During Mr. Hazard's tenure, in-house and outside counsel providing services to the US office could only be appointed with the approval of the Office of Chief Legal Counsel, which had an approval process that was to Mr. Hazard' knowledge and belief was extremely stringent.

94.     Given the deficit in experience, knowledge, and skills, it was perplexing as to how Ms. Meric had been able to pass the Group's normally robust vetting and hiring process.

95.     Upon learning that Mr. Mustafa had hired Ms. Meric to conduct the US office's transactional work despite her inexperience, Mr. Hazard approached Mr. Mustafa to determine whether the hiring of Ms. Meric could be reversed, or whether she would be working on administrative rather than transactional related matters.

96.     Mr. Hazard's inquiry into the work Ms. Meric would be responsible for was particularly important and relevant as the Company was in pre-litigation with the former in-house counsel for B&B Hotels US, Violetta Longino.

97.     Ms. Longino was a highly experienced transactional attorney who had been employed by Accor Hotels prior to joining B&B Hotels.

98.     After she departed, Ms. Longino alleged that she had been wrongfully terminated.

99.     To Mr. Hazard's knowledge, the Company's defense partly relied on its claim that Ms. Longino's position had been eliminated.

100.    As such, Mr. Hazard – and upon information and belief, Mr. Mustafa as well – had been advised by employment counsel to not replace Ms. Longino for some time as doing so could jeopardize the Company's defense.

101.    Mr. Hazard reminded Mr. Mustafa of these cautions from employment attorneys and voiced his own reservations with hiring Ms. Meric to replace Ms. Longino.

102.    However, Mr. Mustafa insisted that he had made an irrevocable commitment to Ms. Meric to hire her as the new in-house counsel and that he intended to follow through on this decision.

103.    Mr. Mustafa also alluded to the idea that lawyers were essentially fungible.

104.    Mr. Hazard, alarmed by this lack of understanding of the importance of having a competent and experienced in-house attorney, raised the importance of having qualified counsel given the complexity of the matters that B&B regularly dealt with.

105.    Mr. Hazard affirmed that he was supportive of hiring in-house counsel but explained that it was crucial to the success of B&B to hire a lawyer with substantial transactional experience in the hotel industry.

106.    Mr. Hazard also voiced his specific concern that Ms. Meric's limited background in crucial legal areas would inhibit their ability to engage in idea exchanges – a valuable benefit that comes with collaborating with highly experienced counsel.

107.     A further disadvantage of Ms. Meric's limited background in complex legal matters related to the hotel industry is that Mr. Hazard would essentially need to train Ms. Meric on the nuances of how hotel deals are conducted, adding yet another responsibility to his already overburdened work schedule.

108.     Mr. Hazard also raised with Mr. Mustafa that a condition of his employment had been that he would be provided with competent legal support and that hiring Ms. Meric was a breach of that promise.

109.     Given the foregoing, Mr. Hazard had serious misgivings about the hiring of Ms. Meric and was particularly ill at ease with the prospect that hiring Ms. Meric would put the Company at risk and threaten its ability to deliver on its commitments.

110.     And indeed, shortly after Ms. Meric began her employment with B&B Hotels US, her limited experience began to cause issues for the Company.

111.     Mr. Hazard found it difficult to rely on Ms. Meric's counsel, as her work frequently had errors and omissions, and Ms. Meric clearly exhibited a lack of understanding of B&B's deal structures, protocols, policies, procedures, and growth strategy, as well as basic negotiation techniques and construction agreements.

112.     Concerningly, Mr. Hazard also received multiple unsolicited complaints from a variety of third parties who described Ms. Meric as "hostile," "threatening," "unprofessional," "insecure," and "unknowledgeable."

113.     Additionally, staff of the US office remarked on occasion to Mr. Hazard that Mr. Mustafa showed favoritism towards Ms. Meric, including by permitting Ms. Meric to take her full complement of annual PTO within her first three months of employment despite that B&B policy prohibits staff from taking "advances" on PTO.

114.    Despite that Mr. Hazard's reservations about the hiring of Ms. Meric proved to be accurate, Mr. Mustafa dug in his heels regarding his decision to hire Ms. Meric as in-house counsel.

115.    In fact, Mr. Mustafa swiftly retaliated against Mr. Hazard for raising concerns about Ms. Meric's hiring.

116.    Over the course of the month following Mr. Hazard raising his concerns, Mr. Mustafa stripped Mr. Hazard of his most significant job responsibilities and re-assigned them to Ms. Meric.

117.    The dispossession of his duties substantially interfered with Mr. Hazard's ability to do the job that he was hired to do.

118.    Due to Mr. Mustafa's retaliatory action towards Mr. Hazard, Mr. Hazard was unable to set and manage negotiating strategy, communicate with sellers and investors, communicate directly with his outside counsel, or select and manage third party due diligence professionals.

119.    Mr. Hazard was also unable to use the authority originally granted to him to manage all other aspects of a deal evaluation necessary for him to endorse the deal to the Company's investors, board and ownership.

120.    Full control and 360-degree visibility over all aspects of a hotel acquisition deal by the deal executive is crucial to a deal's success.

121.    Without that control and visibility, a deal is likely to be unsuccessful or unsatisfactory to the parties.

122.    Due to the stripping of his most consequential responsibilities, Mr. Hazard was effectively demoted from his SVP title to that of a junior "deal bird dog."

123.     This greatly harmed the reputation Mr. Hazard had built over decades of accomplishment in the hotel industry and treated the great value that Mr. Hazard had brought to B&B with indifference.

124.     Additionally, the transfer of Mr. Hazard's most consequential job duties meant that Mr. Hazard was unable to effectively carry through with finalizing hotel deals.

125.     As such, it became clear to Mr. Hazard that B&B Hotels US would not be able to close hotel acquisition deals as originally expected.

126.     This was particularly concerning to Mr. Hazard as a substantial component of his compensation package was dependent on deal success.

127.     With Mr. Hazard no longer being able to have control and visibility over deals, and with his *de facto* demotion, it became obvious that Mr. Hazard would not achieve the compensation potential he had been promised when he was hired.

128.     Mr. Mustafa's lack of leadership and practical business skills, combined with the lack of competent legal support, greatly affected the US side of B&B Hotels.

129.     Specifically, the US office had no strategic growth plan (in fact Mr. Mustafa did not call a staff meeting until August); B&B's renovation crisis was not being addressed and was worsening; critical deal decisions were being made without regard for practical or financial implications; long standing corporate policies were being violated; office morale was at an all-time low; crucial employees quit; misleading information was being provided to Stakeholders; and financial losses were mounting without an end in sight.

130.     Meanwhile, despite Mr. Mustafa attending the orientation tour in Europe, which was intended to train him on the Company's policies, procedures, and business planning, Mr.

Mustafa showed no interest in familiarizing himself with any of these crucial aspects of the Company's operations.

131.     Additionally, Mr. Mustafa refused to familiarize himself with the Company's financial projection models, the details of existing deals (including PSAs, leases, and construction contracts) or with the Company's policies and procedures including his review responsibilities.

132.     Mr. Mustafa was also never available on weekends or holidays and on multiple occasions, was inexplicably missing from the office during business hours.

133.     Making matters worse, Mr. Mustafa was away from the office for nearly the entire month of June to tour hotels in Europe and to vacation.

134.     B&B staff were particularly demoralized by Mr. Mustafa's decision to vacation as it elongated his already extended absence and came only two months into his term as CEO.

135.     Due to Mr. Mustafa's inability and refusal to inspire morale or lead the Company's forward movement in the US, the workplace, which was once joyful and dynamic, became a place of despondency and dismay.

136.     Indeed, lower-level US office staff who had once held high hopes for their work and the Company began to confide in Mr. Hazard that they were highly dissatisfied with Mr. Mustafa's style, their own job security and the Company's lack of any meaningful accomplishments or progress in regard to opening hotels and growing the business.

137.     The low morale and concerns about Mr. Mustafa and the lack of growth of US operations were not limited to lower-level office personnel.

138.     Over a three-month period, two key employees of B&B resigned.

139.     Both informed Mr. Hazard that the reasons for their resignation were the toxic corporate work environment and concerns with Mr. Mustafa's capabilities.

140.     One of these employees who resigned also complained that her decision to leave was in part due to Mr. Mustafa reneging on a promise made as a condition to her employment.

141.     The B&B Hotels US office is thinly staffed, and the loss of two highly specialized and knowledgeable senior staff significantly harmed B&B and its operations.

142.     Despite being stripped of the ability to manage his projects, Mr. Hazard remained responsible for "selling" Company deals to outside investors and preparing Submittal Materials for Stakeholders.

143.     Among other things, Mr. Hazard was often asked by investors and Stakeholders to confirm that the US team was in control over its existing assets and that it had resolved the more serious of B&B's renovation problems.

144.     However, Mr. Hazard could not in good faith affirm these inquires, as it was clear to Mr. Hazard that B&B was not in good standing.

145.     Specifically, significant mistakes were being made, many communications with applicable Stakeholders regarding the status of certain projects were misleading, and projects were being mishandled.

146.     Among the projects and/or events that unfurled over the summer that were mismanaged and posed significant ethical and fiduciary concerns to Mr. Hazard were: (i) Jacksonville West's failed Plan A and Plan B; (ii) the threshold, mural, desk chair and 40-year inspection issues at MIA; (iii) the wasteful alternative business plan exercise in Neptune Beach; (iv) the 12-month renovation delay at Jacksonville Airport; (v) the inappropriate demand for a

$50,000 non-refundable deposit at Neptune Beach, (vi) the ongoing Orlando saga, and (vi) the actual physical condition of the Daytona Beach hotel.

147.     Given B&B's serious deficiencies in meeting project expectations and goals, Mr. Hazard made clear to Mr. Mustafa and others that he would not participate in unethical conduct and would not make misleading representations to Stakeholders that painted B&B's business in a more positive light than it warranted.

148.     Mr. Mustafa did not take well to Mr. Hazard's refusal to participate in unethical conduct, leading to increasing hostility towards and retaliation against Mr. Hazard.

149.     Additionally, during his tenure, Mr. Hazard discovered that B&B was committing "misrepresentations by omission."

150.     Specifically, all Submittal Materials presented to Stakeholders are expected and presumed by such Stakeholders to have been subjected to a rigorous and thorough review process.

151.     However, under Mr. Mustafa's leadership, Submittal Materials had never undergone any form of critical review.

152.     This omission was never disclosed to Stakeholders or other external parties.

153.     Mr. Mustafa's failure to ensure that a Submittal Material was subjected to proper review, and the withholding of this fact from Stakeholders, exposes B&B to significant litigation risk as it would be considered an act of gross negligence and a breach of fiduciary duty.

154.     Indeed, should action be pursued against B&B in this regard, it is unlikely that B&B would succeed on the merits.

155.    Moreover, given the inexcusable nature of this dereliction of duty, it is unlikely that any litigation claim arising from the CEO's failure to review would be covered under most insurance policies.

156.    In early July 2025, Mr. Hazard contacted Mr. Duchini after he learned that, upon information and belief, Mr. Mustafa and Ms. Meric took actions to induce a Company investor to post a $50,000 non-refundable deposit on a deal that had no reasonable prospects for success without properly informing the investor of the risks of the deal.

157.    Whether or not Mr. Mustafa's and Ms. Meric's actions were willful or the result of simple incompetence was not of importance to Mr. Hazard.

158.    The fact remained that the working conditions at B&B had become beyond unacceptable.

159.    Additionally, as an SVP, Mr. Hazard was aware that he had an implied responsibility to report the US dereliction, waste and mismanagement to the Group so that the Group could take steps to redress the situation at B&B.

160.    Mr. Hazard was also concerned that the mismanagement of the US office was inconsistent with the standards and expectations of Goldman Sachs, the majority owner of B&B Hotels.

161.    As such, Mr. Hazard advised Mr. Duchini of the lack of renovation progress at B&B Hotels US, his concerns regarding Mr. Mustafa's lack of qualifications and experience, the work environment toxicity, and the impact these three factors were having on B&B and its business.

162.     In this conversation, Mr. Hazard also asked Mr. Duchini for advice on whether he might have other options within the Company that would not result in his separation or the unraveling of the hard work and accomplishments he and Mr. Duchini had achieved.

163.     Mr. Duchini mentioned that he had heard chatter about the conditions in the US office within halls of the Paris headquarters, which seemed to be attributable to Benjamin LaCroix.

164.     As both Mr. Hazard and Mr. LaCroix appeared to be having similar concerns, Mr. Duchini recommended that Mr. Hazard reach out to Mr. LaCroix, who was in Brazil at the time, and suggest the idea of the two of them raising their concerns collectively with Mr. Collet.

165.     As suggested, Mr. Hazard held a confidential conversation with Mr. LaCroix on July 3, 2025, during which the pair discussed the many problems they were seeing at B&B Hotels US.

166.     Mr. Hazard and Mr. LaCroix spoke at length about Mr. Mustafa's ineffectiveness as a leader and the negative impact he was having on office morale and the financial performance of the US operation.

167.     Mr. Hazard also raised his serious integrity and fiduciary concerns with regard to the lack of a proper review process for Submittal Materials and the deception of Stakeholders.

168.     Mr. Hazard specifically told Mr. LaCroix that he could not and would not make any more representations to Stakeholders that could be considered misleading.

169.     Mr. Hazard also discussed his concerns with the duplicity of the Neptune Beach deposit incident.

170.     Towards the end of the conversation, Mr. Hazard and Mr. LaCroix agreed that the problems with the US office were both significant and serious and that real resolution would require intervention from the Group's senior leadership.

171.     Mr. Hazard subsequently proposed that he and Mr. LaCroix speak collectively to Mr. Collet.

172.     However, Mr. LaCroix immediately and vehemently declined this offer as Mr. LaCroix believed that regardless of the merits of their shared concerns, Mr. Collet would consider the two of them to be "traitorous" and "disloyal" and take retaliatory actions (i.e. "fire them").

173.     Given the forcible nature of Mr. LaCroix's rejection, Mr. Hazard withdrew the idea, promising that their conversation would remain confidential.

174.     However, the concerns that Mr. Hazard raised during this conversation soon became known to Mr. Collet and Mr. Mustafa.

175.     On July 23, 2025, Mr. Mustafa confronted Mr. Hazard, saying that he had heard from a "reliable confidential source" that Mr. Hazard was "badmouthing" him and accusing him of "fraudulent" activity.

176.     Mr. Mustafa soon disclosed that the "reliable confidential source" was Mr. LaCroix, who had evidently shared Mr. Hazard's portion of the July 3rd conversation with Mr. Collet who, in turn, relayed that information to Mr. Mustafa.

177.     Mr. Hazard acknowledged to Mr. Mustafa that he had held a discussion with Mr. LaCroix on July 3rd, emphasizing that the impetus of the conversation were his legitimate concerns about a) the lack of communication, strategy and positive morale in the US office under

the new leadership, and b) the veracity of certain representations being made to certain Stakeholders.

178. Mr. Hazard maintained that these were not new concerns, reminding Mr. Mustafa that he had broached these issues with Mr. Mustafa in the past, but to no avail.

179. Mr. Hazard also communicated that he had discussed these issues with Mr. LaCroix in the hopes of developing a productive resolution to his concerns and that there was nothing inappropriate or unethical about their conversation.

180. During this conversation, Mr. Mustafa casually mentioned that that he was hiring someone to "find investors," which was confusing to Mr. Hazard as the US operation was not in need of additional investors.

181. With no other plausible explanation, Mr. Hazard deduced that, as predicted by Mr. LaCroix, Mr. Mustafa and Mr. Collet were now branding him as "traitorous" and "disloyal" and would be taking retaliatory action against him.

182. Specifically, Mr. Hazard anticipated that Mr. Mustafa and Mr. Collet were plotting to remove him to prevent him from exposing his well-documented concerns about US operations to the Group and for refusing to engage in unethical activity by misleading stakeholders.

183. Considering the obvious implications of Mr. Mustafa's new hire comment, and with conditions in the US office worsening, Mr. Hazard determined that he had no choice but to advise the Group that he would need to reconsider his future with the Company if circumstances did not improve.

184. Accordingly, on August 7, 2025, Mr. Hazard drafted correspondence documenting his concerns in writing, including stating: "In good conscience, I cannot continue to

represent to the B&B Executive Committee, to the Goldman Sachs board or to investors that their investments are secure, that the US operation is in good hands or that the growth outlook is positive. I will not lie to our stakeholders or compromise my integrity," and circulated it to Mr. Duchini for his input.

185. As the Group was on August recess, Mr. Duchini informed Mr. Hazard that there was no one to receive his letter and recommended that Mr. Hazard hold off on distributing the letter until the following month.

186. Mr. Hazard agreed to wait and send the letter in September.

187. In late August, Mr. Hazard was informed that Mr. Collet would be making an unscheduled visit to the Group's office in Miami, Florida on September 2, 2025.

188. Mr. Hazard decided that he would use the trip as an opportunity to present his correspondence to Mr. Collet in person.

189. However, that opportunity never presented itself.

190. Mr. Hazard and Mr. Collet arrived in the Miami office on September 2.

191. In contrast to previous interactions between Mr. Collet and Mr. Hazard, Mr. Collet's demeanor was surly and absent of his typical good-natured banter.

192. In fact, throughout the entire day, the Mr. Collet and Mr. Hazard exchanged almost no words.

193. The following day, on September 3, Mr. Mustafa and Mr. Collet went to Orlando, and Mr. Hazard had no interaction with either individual.

194. When Mr. Hazard encountered Mr. Collet on September 4, Mr. Collet continued to ignore Mr. Hazard.

195.     It therefore became evident to Mr. Hazard that before the end of the day, Mr. Collet and/or Mr. Mustafa would engage in further retaliatory conduct directed towards him.

196.     Mr. Hazard received what appeared to be confirmation of this intent, as in the late morning, Mr. Hazard observed Mr. Collet meeting individually with two young men in what clearly were interviews.

197.     With the combination of Mr. Mustafa's new hire comment and Mr. Collet's demeanor, Mr. Hazard deduced that one or both men were being interviewed to take his job.

198.     At that point, Mr. Hazard printed and executed the letter he previously shared with Mr. Duchini and prepared himself for an interaction with Mr. Collet, which he expected to involve retaliation.

199.     Mr. Collet, however, disappeared from the office in the early afternoon without ever speaking to Mr. Hazard.

200.     At approximately 3 p.m. that same day, Mr. Mustafa asked Mr. Hazard to see him in his office at 4 p.m.

201.     Upon Mr. Hazard entering the office, Mr. Mustafa asked the Office Manager, Elaine Power, to also come in.

202.     Before Ms. Power entered the office, Mr. Hazard stated that he had a matter to discuss with Mr. Mustafa first and shut the door.

203.     Mr. Hazard then presented the executed letter he had previously shared with Mr. Duchini and explained that the circumstances described therein and that he had previously raised with Mr. Mustafa were creating an impossible working situation.

204.     However, Mr. Mustafa repeatedly interrupted Mr. Hazard and misrepresented Mr. Hazard's statement as him submitting a "resignation."

205.     Each time Mr. Mustafa asserted that Mr. Hazard was resigning, Mr. Hazard emphasized that he was not in fact resigning and urged Mr. Mustafa to read the letter.

206.     However, Mr. Mustafa continued to insist that Mr. Hazard was resigning.

207.     At that point, Mr. Hazard opened the door and asked Ms. Power to come in.

208.     With Ms. Power in the room as a witness, Mr. Hazard carefully and purposefully repeated no less than three times that he was not resigning.

209.     At some point in the conversation, Mr. Mustafa muttered something about not liking the way Mr. Hazard talked and demanded to know if Mr. Hazard had a copy of some document signed by the "former CEO."

210.     By then, Mr. Mustafa was clearly distraught and snapped at Ms. Power to "be quiet" when she inquired as to the document Mr. Mustafa had referenced.

211.     Mr. Mustafa then demanded that Mr. Hazard return his computer and keys, stated that representatives from Human Resources and Legal would be in touch, and instructed Mr. Hazard to prepare an expense report.

212.     Mr. Hazard submitted an initial expense report on August 25, 2025, and an additional expense report on September 25, 2025, but has not received reimbursement for the August statement.

213.     Since his conversation with Mr. Mustafa on September 4th, Mr. Hazard has repeatedly attempted to advise B&B of the basis for his concerns and has reiterated and clarified that he did not resign from his position.

214.     On September 5, Mr. Hazard emailed the executed correspondence he had previously shared with Mr. Duchini to Consuelo Corridori, Group Chief People and Talent Officer, and copied Mr. Collet and Chief Executive Officer, Celine Vercollier.

215.     Despite Mr. Hazard clearly stating that he did not resign and the contents of his letter indicating that his concerns did not amount to a resignation, on September 9, Mr. Hazard received an email from Mr. Mustafa insisting that Mr. Hazard had resigned.

216.     Mr. Hazard forwarded a response to Ms. Corridori suggesting that she interview Ms. Power as to what had transpired in Mr. Mustafa's office on September 4th.

217.     Notably, upon information and belief, some of Mr. Hazard's duties are now being performed by a new employee, J.T. Rincon, who is much younger and much less experienced than Mr. Hazard in the hotel industry.

218.     This development raises additional issues regarding B&B's motivations for its actions against Mr. Hazard and represents a continuation of B&B's pattern of irresponsibly retaining individuals who lack the necessary experience to protect B&B's interests and move the business forward.

219.     Mr. Hazard has received no clarification regarding his current employment status with B&B Hotels US, despite commitments to communicate with him regarding his employment.

220.     B&B's distortion of Mr. Hazard's statements as signaling a "resignation" is in retaliation for Mr. Hazard opposing unethical practices when he refused to fraudulently mislead investors and stakeholders about the health of the Company.

221.     Mr. Hazard has clearly and repeatedly explained, both orally and in writing, that he has not resigned from his position and that an independent investigation by the Group as to the events witnessed in Mr. Mustafa's office on the afternoon of September 4, 2025, will confirm that the fact that he did not resign.

222.    Based on the foregoing, by convincing Mr. Hazard to accept employment with Defendant B&B, and to leave his previous, lucrative employment based upon representations that the Defendant B&B knew were false at the time they made them to Mr. Hazard, Defendant fraudulently induced Mr. Hazard to leave his prior employment, forego other favorable opportunities, and accept employment with Defendant B&B.

223.    Defendant B&B also breached certain contracts and agreements with Mr. Hazard regarding his employment by failing to provide Mr. Hazard with the salary and bonuses it had promised.

224.    Additionally, given his treatment during his employment with B&B, as well as the events thereafter, Mr. Hazard maintains that Defendant B&B retaliated against him for opposing and refusing to engage in conduct he reasonably believed to be fraudulent and/or unethical.

225.    Defendant B&B retaliated against Mr. Hazard for opposing and refusing to engage in fraudulent and/or unethical conduct.

226.    As a result of Defendant B&B's unfulfilled commitment to Mr. Hazard regarding his salary and compensation, the related professional sacrifices Mr. Hazard made to accept a position with Defendant B&B, Defendant B&B's decision to terminate Mr. Hazard and other wrongful conduct perpetrated against Mr. Hazard by Defendants, Mr. Hazard has suffered significant financial losses including, among other things, loss of employment and loss of wages.

227.    Mr. Hazard has suffered harm to his reputation in the community and other harm and damages as a direct and proximate result of the actions and inactions of the Defendants.

228.    As a result of Defendants' conduct described herein, Mr. Hazard has suffered and continues to suffer significant emotional distress and hardship.

229.     Mr. Hazard has suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions and/or inactions of Defendants.

230.     Defendants and their agents acted with knowledge of, or in reckless disregard of the probability that their actions and inactions would cause Mr. Hazard to suffer emotional distress.

231.     As a result of the Defendants' conduct described herein, Mr. Hazard has incurred a significant obligation for attorneys' fees and costs of bringing this action.

<u>**COUNT I**</u>
**Wrongful Termination**
**(Plaintiff v. Defendant B&B)**

232.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

233.     Mr. Hazard opposed and refused to participate in unethical, fraudulent and/or illegal activity engaged in by Defendant B&B, as alleged herein.

234.     Mr. Hazard was retaliated against and terminated for his opposition and refusal to engage in unethical, fraudulent and/or illegal activity in violation of Pennsylvania public policy.

235.     The above-described conduct of Defendant, in retaliating against Mr. Hazard resulting in his termination, represents wrongful termination pursuant to the common law of the Commonwealth of Pennsylvania.

236.     Said violations warrant the imposition of punitive damages.

237.     As the direct and proximate result of Defendant's violations of Pennsylvania public policy, Plaintiff Robert Hazard has sustained a loss of earnings, severe emotional and psychological distress, personal embarrassment, loss of self-esteem, loss of earning power, as well as back pay, front pay, interest due thereon, and has incurred attorneys' fees and costs.

## COUNT II
### Breach of Contract
### (Plaintiff v. Defendant B&B)

238.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

239.     Defendant B&B entered into a contract with Mr. Hazard wherein it agreed to Mr. Hazard that he would earn a certain amount of compensation due to a highly competent leader and legal team supporting his deal success, that it would provide Mr. Hazard with a defined severance package if his employment did not work out for reasons beyond his control and that it would reimburse expenses.

240.     Defendant B&B breached its contract with Mr. Hazard as alleged herein.

241.     Mr. Hazard seeks damages for Defendant B&B's breaches of the aforementioned contract.

242.     Defendant B&B's conduct is without excuse or justification.

## COUNT III
### Breach of Oral Contract
### (Plaintiff v. Defendant B&B)

243.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

244.     Count III is brought in the alternative to Count II.

245.     In the alternative, B&B Hotels orally agreed, promised and/or represented to Mr. Hazard that Mr. Hazard would report to and receive support from a highly experienced and competent leader, as well as receive support from a highly competent and experienced legal team, both of which would allow him to achieve his compensation potential due to deal success,

and that it would provide Mr. Hazard with a defined severance package if his employment did not work out for reasons beyond his control.

246.     Notwithstanding the foregoing, B&B reneged on its agreement, promises and representations to Mr. Hazard by retaining an incompetent leader and ineffective legal support, impacting his compensation potential, and unlawfully withholding from Mr. Hazard his salary and bonuses.

247.     In so doing, B&B has failed and refused to abide by the terms of its promises and agreement with Mr. Hazard.

248.     B&B is in material breach of its oral agreement with Mr. Hazard.

249.     All conditions precedent, if any, necessary to bring Mr. Hazard's action against B&B have been satisfied.

250.     As a direct, foreseeable, natural, ordinary and proximate result of B&B's breaches and other bad faith conduct, Plaintiff Robert Hazard has suffered significant financial and other damages including, but not limited to, loss of earnings, loss of employment opportunities, severe emotional and mental distress, and other damages and harm.

## COUNT IV
**Breach of Implied Contract for Employment Based on Additional Consideration**
**(Plaintiff v. Defendant B&B)**

251.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

252.     As set forth above, Mr. Hazard has alleged facts from which it can be determined that there was an implied contract for employment between Mr. Hazard and B&B based upon additional consideration under which Mr. Hazard would receive support from a competent leader

and effective legal support, which would lead to deal success and the ability to earn his compensation potential.

253. B&B's termination of Mr. Hazard without just cause was a breach of the implied contract for employment between Mr. Hazard and B&B.

254. In accepting employment with B&B, vacating his lucrative and stable position with HotelAVE and foregoing other employment opportunities, Mr. Hazard suffered significant hardship.

255. The parties understood that they were creating an implied contract based upon the promises made to Mr. Hazard.

256. Based upon the promises made to Mr. Hazard, the parties understood that they were creating an implied contract for employment.

257. As a direct result of the unlawful employment practices engaged in by Defendant, Plaintiff Robert Hazard has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, as well as back pay, front pay and interest due thereon.

258. Defendant B&B's conduct is without excuse or justification.

**COUNT V**
**Promissory Estoppel/Detrimental Reliance**
**(Plaintiff v. Defendant B&B)**

259. Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

260. In the alternative, Defendant made promises to Mr. Hazard regarding the expectation of his compensation potential predicated upon the retainment of a competent leader and effective legal support.

261.     Mr. Hazard reasonably relied upon these promises to his detriment by foregoing other entitlements and foregoing from engaging in other conduct.

262.     Defendant did not honor its promises, as deals were not closed as expected due to the hire of an incompetent and ineffective leader and legal support team, and as such Mr. Hazard has not been paid his promised salary and bonuses.

263.     Mr. Hazard suffered damages as a result of his reasonable reliance upon Defendant's promises.

264.     As the direct result of the aforesaid unlawful conduct engaged in by Defendant, Plaintiff Robert Hazard has sustained a loss of earnings and commissions, loss of incentive and bonus payments, interest due thereon and has incurred an obligation for attorneys' fees and costs.

**COUNT VI**
**Unjust Enrichment**
**(Plaintiff v. Defendant B&B)**

265.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all preceding paragraphs as if fully set forth at length herein.

266.     Mr. Hazard conferred benefits upon Defendant in the form of tirelessly working for Defendant to promote the success of its business, with the expectation of being paid appropriate compensation with respect to the benefits he had conferred upon Defendant.

267.     Defendant appreciated the benefits conferred by Mr. Hazard.

268.     Defendant accepted the benefits conferred by Mr. Hazard under circumstances that would make it inequitable for Defendant to retain such benefits without payment of value to Mr. Hazard.

269. As the direct result of the aforesaid unlawful conduct engaged in by Defendant, Plaintiff Robert Hazard has sustained a loss of earnings and commissions, loss of incentive and bonus payments, interest due thereon and has incurred an obligation for attorneys' fees and costs.

## COUNT VII
### Fraudulent Inducement
### (Plaintiff v. Defendant B&B)

270. Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

271. Defendant B&B fraudulently induced Mr. Hazard to accept employment with Defendant based on the fraudulent promises that he would report to and receive support from a highly experienced and competent leader, as well as receive support from a highly competent and experienced legal team, both of which would allow him to achieve his compensation potential due to deal success, and that it would provide Mr. Hazard with a defined severance package if his employment did not work out for reasons beyond his control.

272. At the time Defendant B&B made the above representations, it did not intend to abide by the representations it had made.

273. The misrepresentations made by Defendant were fraudulent.

274. The misrepresentations made by Defendant were of material facts.

275. Plaintiff relied on the false and/or misleading statements, conduct and representations of Defendant and sustained the losses and damages as previously set forth herein.

276. The misrepresentations by Defendant induced Plaintiff to leave a lucrative position and forego other very favorable employment opportunities.

277. Defendant intended that Plaintiff would rely upon the misrepresentations.

**Pennsylvania Wage Payment and Collection Law,**
**43  Pa. C. S. §260.1, et seq. ("WPCL")**
**(Plaintiff v. All Defendants)**

278.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

279.     At all relevant times, Defendant B&B was an employer as defined by the WPCL.

280.     At all relevant times, Defendant Amir Mustafa was an employer and/or person as defined by the WPCL.

281.     At all relevant times, Plaintiff was an employee of Defendant B&B as defined by the WPCL.

282.     Plaintiff was entitled to severance in the event his employment was terminated for reasons beyond his control.

283.     Plaintiff was entitled to repayment of expenses incurred on B&B's behalf.

284.     Despite the foregoing, Defendant B&B has failed and refused to pay Plaintiff the earned but unpaid severance pay and his expenses he is due.

285.     Plaintiff's severance and unreimbursed expenses fall within the definition of wages contained in the WPCL.

286.     Defendant Amir Mustafa was a decision-maker with respect to the decision to refuse to pay Mr. Hazard his earned but unpaid wages.

287.     Defendants have failed and refused to pay Mr. Hazard his earned wages for a period beyond thirty days after regularly scheduled paydays.

288.     Mr. Hazard has demanded payment of his earned wages, but Defendants have failed and refused to pay Mr. Hazard his earned but unpaid wages.

289.     Defendants have no good faith argument that Mr. Hazard is not due his earned but unpaid wages.

290.     As a result of Defendants' failure to pay Plaintiff's earned wages due to him, Defendants violated the WPCL and the regulations promulgated thereunder.

291.     By virtue of Defendants' violations of the WPCL, Plaintiff is entitled to recover from Defendants his unpaid wages, plus liquidated damages, interest, costs of suit and attorneys' fees and other such legal and equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

292.     Plaintiff Robert Hazard repeats and incorporates by reference the allegations of all previous paragraphs as if fully set forth at length herein.

**WHEREFORE**, Plaintiff Robert Hazard respectfully requests that this Court enter judgment in his favor and against Defendants and Order:

a.   Appropriate equitable relief;

b.   Defendant B&B to compensate Plaintiff with a rate of pay and other benefits and emoluments of employment to which he would have been entitled had he not been subjected to unlawful retaliation;

c.   Defendants to compensate Plaintiff with the wages and other benefits and emoluments of employment lost because of its unlawful conduct;

d.   Defendant B&B to pay Plaintiff punitive damages;

e.   Defendants to pay Plaintiff liquidated damages;

f.   Defendant B&B to pay Plaintiff compensatory damages for future pecuniary losses, pain and suffering, inconvenience, mental anguish, loss of employment and other nonpecuniary losses as allowable;

g.  Defendants to pay Plaintiff's costs of bringing this action and his attorneys' fees;

h.  Plaintiff be granted any and all other remedies available pursuant to the WPCL and
Pennsylvania common law; and

i.  Such other and further relief as is deemed just and proper.

### JURY DEMAND

Plaintiff Robert Hazard hereby demands trial by jury as to all issues so triable.

By:  *[signature]*
Jennifer C. Bell, Esquire
Christopher A. Macey, Jr., Esquire
Bell & Bell LLP
1617 John F. Kennedy Boulevard
Suite 1254
Philadelphia, PA 19103
(215) 569-2500

*Attorneys for Plaintiff*
*Robert Hazard*

Dated: December 15, 2025